**F I L E D**
**October 21, 2005**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

ANNABELLE D. MATA,

       Plaintiff-Appellant,

v.

JUDY SAIZ, AMY HOUGH, DONNA
QUINTANA, and DANA WELDON,

       Defendants-Appellees.

No. 03-1247

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 01-B-1633 (OES))**

---

Robert C. Ozer (Renée C. Ozer with him on the briefs) of Ozer & Ozer, P.C., Colorado Springs, Colorado, for Plaintiff-Appellant.

Thomas J. Lyons (Andrew D. Ringel and Edmund M. Kennedy with him on the brief) of Hall & Evans, L.L.C., Denver, Colorado, for Defendants-Appellees.

---

Before **HARTZ**, **SEYMOUR** and **BALDOCK**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Annabelle D. Mata, an inmate of the Pueblo Minimum Center (PMC), filed a 42 U.S.C. § 1983 action against four Colorado Department of Corrections (DOC) employees alleging violations of the Eighth and Fourteenth Amendments to the United States Constitution. Ms. Mata claims defendants failed to provide her with constitutionally adequate medical care when she suffered severe chest pains culminating in a heart attack. The district court granted summary judgment for defendants Dana Weldon, Donna Quintana, and Amy Hough, determining Ms. Mata had failed to raise a genuine issue of material fact with respect to an Eighth Amendment claim and that defendants were therefore entitled to qualified immunity. The court granted partial summary judgment for defendant Judy Saiz. The court then certified its order as a final judgment pursuant to FED. R. CIV. P. 54(b).

Ms. Mata appeals, contending the district court erred when it determined there were no genuine issues of material fact concerning (1) whether Ms. Weldon, Ms. Quintana, and Ms. Hough were deliberately indifferent to Ms. Mata's serious medical needs and (2) whether Ms. Saiz was deliberately indifferent to Ms. Mata's serious medical needs up to the time Ms. Saiz received directions from a doctor to immediately send Ms. Mata to the hospital. A majority of the panel affirms the district court's grant of summary judgment for defendants Quintana, Hough and Saiz and reverses the court's grant of summary judgment for

defendant Weldon.

**SEYMOUR, J.**, joined by **HARTZ, J.**, as to defendants Weldon, Hough, and Saiz.

## I.

"We review a grant of summary judgment on the basis of qualified immunity *de novo*." *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004). Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "If our inquiry reveals no genuine issue of material fact in dispute, then we review the case to determine if the district court correctly applied the substantive law." *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 766 (10th Cir. 1999) (citing *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996)). We construe the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1255 (10th Cir. 2001).

After a defendant invokes qualified immunity, the plaintiff in a case like this one, which alleges a violation of the Eighth Amendment, must demonstrate that the defendants actions violated a specific constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the plaintiff fails to meet her burden on this threshold

inquiry, the qualified immunity inquiry comes to an end. *Id.* If the plaintiff meets this initial burden, she must then show that the constitutional right was "clearly established" prior to the challenged official action. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (internal quotations omitted). Because the district court never reached the second prong of the qualified immunity analysis and there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right,[1] we concern ourselves solely with the following question in the summary judgment context: viewing the evidence in the light most favorable to Ms. Mata, do the facts show that the defendants' actions violated her Eighth Amendment rights? *Saucier*, 533 U.S. at 201; *Gonzales v. Martinez*, 403 F.3d 1179, 1185-86 (2005).

Viewed most favorably to Ms. Mata, the record reveals the following background to this litigation. At the time of the events giving rise to her claims, Ms. Mata was incarcerated at the PMC. During the evening of October 29, 2000, she sought medical attention because she was experiencing severe chest pain.

---

[1]Indeed, the defendants do not contend that the constitutional right at issue here was not clearly established.

Aplt. App. at 184.  Ms. Weldon, a Licensed Practical Nurse (LPN), was on duty at the PMC infirmary that evening.  *Id.* at 184, 190.  Ms. Mata reported her chest pain to Ms. Weldon, who responded there was nothing she could do because the infirmary was closed and Ms. Mata would have to return to sick call at the infirmary the following morning.  *Id.* at 184.

Ms. Mata returned to the infirmary, as advised, on the morning of October 30, and informed Ms. Quintana, LPN, of her continuing chest pain.  *Id.* at 185, 188.  Ms. Mata reported her chest pain as "eight" on a scale from "zero to ten," with ten translating to the worst pain a patient can imagine and zero being no pain whatsoever.  *Id.* at 195-97.  Ms. Quintana provided Ms. Mata with a nursing assessment which included performing an electrocardiogram (EKG).  *Id.* at 185.  Ms. Quintana read the EKG as normal and gave Ms. Mata a "lay-in," a permission slip to allow her to miss work and other prison-related assignments for the day.  *Id.*  Ms. Mata claims that her pain persisted throughout the day, causing her to report it to several guards, but she did not return to the infirmary again that day.[2]  *Id.*

Upon her return to the infirmary at 6:00 a.m. on the morning of October 31, Ms. Mata was evaluated by Ms. Hough, a Registered Nurse (RN).  *Id.* at 185, 230.

---

[2]Ms. Quintana contends she told Ms. Mata to return to the infirmary if her pain persisted but this fact is disputed by Ms. Mata in her deposition testimony.  Aplt. App. at 110.

Ms. Hough administered a second EKG and told Ms. Mata it was normal, although it is undisputed that this EKG showed changes from the one performed the prior day. *Id.* at 185-87, 231. Ms. Saiz, a Nurse Practitioner (NP), arrived at the infirmary shortly after the evaluation performed by Ms. Hough. *Id.* at 186, 235. Ms. Saiz performed an independent assessment and informed Ms. Mata that she suffered from a chest lining inflammation. *Id.* at 186, 236. Although Ms. Saiz also read the second EKG as normal, she forwarded the EKG printout to a doctor for review. *Id.* at 186. The physician ordered Ms. Saiz to send Ms. Mata immediately to the hospital. *Id.* Ms. Saiz instructed Ms. Mata to return to her housing unit and change into "full greens" for the trip to the hospital. *Id.* Ms. Mata did as she was told, walking approximately two blocks up hill, changing her clothes, and then walking back to the main facility. *Id.* She was then transported to the emergency room at Parkview Hospital in Pueblo, Colorado. *Id.* at 186, 236.

It was determined at the hospital that Ms. Mata had suffered a heart attack. *Id.* at 186. Heart surgery was performed the same day to open an occluded circumflex coronary artery, but it was unsuccessful. Ms. Mata suffered permanent and irreversible damage to her heart and sustained a permanent disability. *Id.* at 266-67.

Ms. Mata filed this action against the four prison nurses from whom she sought treatment, asserting that their failure to provide her adequate medical care

violated the Eighth Amendment. We will set forth further evidence proffered by Ms. Mata in support of her claim as we address specific issues below.

## II.

A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The test for constitutional liability of prison officials "involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (further quotation omitted)). Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. *See, e.g., Green v.*

*Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997). Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quotation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001).

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. *See Estelle*, 429 U.S. at 106. The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Sealock*, 218 F.3d at 1211; *see also Estelle*, 429 U.S. at 104-105 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care").[3]

_____

[3]In *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976), the Supreme Court held that deliberate indifference occurs when prison personnel deny or delay
(continued...)

The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836. The Supreme Court in *Farmer* analogized this standard to criminal

---

[3](...continued)
access to needed medical care, *i.e.*, when they fail to fulfill their gatekeeper role. The Court cited several federal appellate decisions illustrating this proposition. *Id.* at n.10 & 11. For instance, in *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), the inmate-plaintiff claimed he had been deprived of needed medical treatment for a bleeding ulcer despite his repeated requests to prison staff for such treatment, and, as a result, suffered prolonged pain and suffering. *Id.* at 858-59. As the inmate's condition worsened, the prison staff eventually provided him with a mild antacid but consistently refused his requests to see a doctor. *Id.* at 859. The Sixth Circuit held that "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." *Id.* at 860. *Edwards v. Duncan*, 355 F.2d 993 (4th Cir. 1966), involved an inmate who suffered for years from a heart condition and consequentially had been prescribed "a special diet and exemption from duty requiring considerable physical exercise" by the senior medical officer at the prison. *Id.* at 994. The prison staff wilfully deprived the inmate of this specified and needed medical care which resulted in irreparable physical damage to the inmate. *Id.* The Fourth Circuit held that the prisoner stated a cause of action because his gatekeepers had denied him needed and prescribed medical care. *Id.* at 994-95. *See also Jones v. Lockhart*, 484 F.2d 1192, 1193-94 (8th Cir. 1973) (prisoner who sustained back injury and was provided pills at the infirmary but denied permission to see doctor by prison paramedic stated claim for deliberate indifference); *Fitzke v. Shappell*, 468 F.2d 1072, 1074-75 (6th Cir. 1972) (prisoner stated claim of deliberate indifference where prison staff merely told prisoner, who complained of leg pain, limped badly and communicated the need for medical attention, to rub his areas of pain and numbness and failed to obtain medical treatment for him for twelve hours); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir. 1970) (claim of deliberate indifference made where prison staff and doctor removed defendant from hospital after defendant's surgery but prior to his adequate recovery, and did so contrary to the express instructions of defendant's operating surgeons and hospital attendants).

recklessness, which makes a person liable when she consciously disregards a substantial risk of serious harm. *Id*. at 836-38. Thus, "[d]eliberate indifference does not require a finding of express intent to harm." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996) (citation omitted). An inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge of* a *substantial risk* of serious harm." *Farmer*, 511 U.S. at 842 (emphasis added). An official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id*. at 843 n.8. Significantly, this level of intent can be demonstrated through circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Id*. at 842 (internal citations omitted). This is so because "if a risk is obvious so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it." *Garrett*, 254 F.3d at 950 (citation omitted).

Accordingly, in order for Ms. Mata to avoid summary judgment on her Eighth Amendment claims, she was required to set forth facts demonstrating that

her medical need was objectively sufficiently serious, and that defendants' delay in meeting that need caused her substantial harm. *See Sealock*, 218 F.3d at 1210. Then, to meet the subjective prong of the deliberate indifference test, Ms. Mata was required to provide evidence supporting an inference that defendants knew about and disregarded a substantial risk of harm to her health and safety. *See Hunt*, 199 F.3d at 1244.

### III.

### *Objective Component*

Ms. Mata contends her severe chest pain and heart attack each presented a serious medical need for purposes of the Eighth Amendment. As previously noted, in evaluating whether a deliberate indifference claim has been established, we first look to whether the harm suffered rises to a level "sufficiently serious" to be cognizable under the Cruel and Unusual Punishment Clause. *Farmer*, 511 U.S. at 834. The Supreme Court has not elaborated on the objective component of the deliberate indifference test. But given that the purpose for this requirement is to limit claims to significant, as opposed to trivial, suffering, dicta in this circuit's descriptions of the objective component may unnecessarily confuse the matter.

Thus, on several occasions our published opinions have defined a *sufficiently serious medical need* as "one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (internal quotation marks omitted); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002); *Garrett*, 254 F.3d at 949; *Oxendine*, 241 F.3d at 1276; *Hunt*, 199 F.3d at 1224. The problem with this formulation is that it can be read to say that the determination whether a medical need is sufficiently serious is to be made exclusively by the symptoms presented at the time the prison employee has contact with the prisoner. Indeed, that is how Judge Baldock interprets the test in his dissent. We do not view the objective test as so limited. For example, when delay by prison employees results in damage to a prisoner's heart, the question raised by the objective prong of the deliberate indifference test is whether the alleged harm (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious (as argued by Judge Baldock). In this context, the symptoms displayed are relevant only to the subjective component of the test: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?

None of our published opinions stating the above-quoted test has needed to choose whether the test for the objective component applies to (1) the alleged harm to the prisoner or (2) the prisoner's symptoms at the time of the prison

employee's actions. Thus, the view that it applies to the former is neither foreclosed by nor contrary to circuit precedent. Moreover, it is most consistent with the Supreme Court's delineation of the objective component in *Farmer*, *see* 511 U.S. at 834 (stating that the harm "alleged must be, objectively, sufficiently serious"); *see also Wilson v. Seiter*, 501 U.S. 294, 296 (1991) (noting that the objective test inquiry is simply: "Was the deprivation sufficiently serious").

Of course, a prisoner must be careful in selecting what harm to claim. The prisoner may be better off claiming some intermediate harm rather than the last untoward event to befall her. After all, the prisoner may not be able to prove that this last event was caused by any government actor or that the actor who caused the event acted with the requisite culpable state of mind. Accordingly, the prisoner's claim may be based, for example, on intolerable chest pain rather than the subsequent heart damage. Once the prisoner selects the harm, however, the focus of the objective prong should be solely on whether that harm is sufficiently serious. Then the court can turn to causation and the subjective prong. In this case, as we set out below, both Ms. Mata's severe chest pain and her heart attack each are sufficiently serious to satisfy the objective prong.

*Sealock* itself implicitly adopts just such an approach. As in this case, the prisoner presented to prison employees with severe chest pain and ultimately suffered a heart attack. The court briefly considered a possible claim that the heart

attack itself was the sufficiently serious harm to establish the objective component of the deliberate indifference test, but rejected the claim for failure to establish causation, and then turned to other claimed harm:

> We consider, first, whether appellant's need was 'sufficiently serious' to meet the objective element of the deliberate indifference test. Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm. The district court concluded that appellant failed to show that the delay in receiving medical treatment caused him any injury.
>
> Appellant presented general evidence that time is of the essence when someone is experiencing a heart attack. He did not present specific medical evidence of damage to his heart resulting from the delay. Even if appellant failed to show that his heart was damaged by the delay, however, we believe he has shown that his need was sufficiently serious to require prompt medical attention.

*Id*. at 1210 (internal citation omitted). Although the claim for heart damage failed for lack of causation evidence, the quoted language suggests that the ultimate harm, heart damage, would satisfy the objective component.

The court in *Sealock* then addressed the prisoner's symptoms. It did so not to determine whether they were strong evidence of a heart attack, but to evaluate whether they constituted sufficient harm in themselves to satisfy the objective component. The court's discussion was as follows:

> Appellant presented evidence that he suffered from severe chest pain which he reasonabl[y] believed was caused by a heart attack. The pain and suffering imposed by Barrett's failure to get him treatment lasted several hours. The Eighth Amendment forbids 'unnecessary *and wanton* infliction of *pain*.' *Wilson v. Seizer*, 501 U.S. 294, 297.

-14-

> Certainly, not every twinge of pain suffered as a result of delay in medical care is actionable. The evidence in this case, however, sufficiently establishes the objective element of the deliberate indifference test.

*Id.* (internal parenthetical and citation omitted). Thus, severe chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard. *Id.*

In the present case, Ms. Mata presented evidence that she did in fact suffer severe pain for several days, Aplt. App. at 184-85, and expert evidence that she ultimately suffered a heart attack, *id.* at 266 (Aff. of Arthur Levene, MD).[4] As we

---

[4]Defendants suggest that, pursuant to 42 U.S.C. § 1997e, Ms. Mata is only entitled to bring a federal civil suit if she sustained a physical injury due to the conduct of defendants and that she failed to make such a showing prior to her actual heart attack. However, Ms. Mata is suing for the pain she endured, not for emotional injury.

Ms. Mata experienced severe chest pain, ultimately culminating in a myocardial infarction, while in the care of defendants. *See* Aplt. App. at 265 (Aff. of Dr. Levene). Dr. Levene opined that it was "highly likely" Ms. Mata experienced myocardial ischemia on the morning of October 30, 2000 and that there was "a very high degree of probability" Ms. Mata experienced an actual heart attack (myocardial infarction) between the morning of October 30 and 6:30 a.m. the following day. *Id.*

Myocardial ischemia is the "blockage of the coronary arteries resulting in insufficient blood and oxygen reaching the heart." MAYO CLINIC HEART BOOK: THE ULTIMATE GUIDE TO HEART HEALTH 86 (Bernard J. Gersh, ed., 2d ed. 2000). According to the Mayo Clinic,

> [c]ardiac ischemia can be life-threatening. A sudden, severe blockage of a coronary artery may lead to death of part of the heart muscle (heart attack). Cardiac ischemia may also cause an abnormal heart rhythm (arrhythmia), which can lead to fainting or even sudden death. Cardiac ischemia may cause no symptoms, especially in people with diabetes. But symptoms often

(continued...)

reiterated in *Sealock*, the Eighth Amendment forbids such "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (citations omitted). Although "not every twinge of pain suffered as the result of delay in medical care is actionable," Ms. Mata's evidence of pain and suffering goes well beyond a twinge and is sufficient to establish the objective element of the deliberate indifference test. *Sealock*, 218 F.3d at 1210.

Ms. Mata, in fact, exceeded the minimum evidentiary requirement outlined in *Sealock* by presenting specific evidence that she suffered both unnecessary pain and a worsening in her condition – in the form of permanent and irreversible heart damage. Thus, there are genuine factual issues precluding summary judgment against Ms. Mata on the objective component of the *Estelle* test.

### Subjective Component

The closer question is whether Ms. Mata produced evidence sufficient to support a claim that defendants exhibited "deliberate indifference" to her serious

---

[4](...continued)
include: chest pain (angina); neck or jaw pain; arm pain; clammy skin; shortness of breath; nausea and vomiting.
*See* http://www.mayoclinic.com/invoke.cfm?id=HQ01646. A full-blown myocardial infarction describes myocardial ischemia that lasts long enough to result in necrosis or death of myocardial (heart muscle) cells. MAYO CLINIC HEART BOOK at 86. Thus, there is no doubt on the record before us that Ms. Mata offered substantial evidence she suffered physical injury from her chest pains and that defendants' delay in providing proper care contributed to the injury.

medical needs. A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional. *See, e.g., id.* at 1210 (delay of "several hours" in taking inmate with chest pains to hospital violated Eighth Amendment); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) ("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (fifteen minute delay in treating inmate in cardiac arrest may violate Eighth Amendment). We will address the claims against each defendant in chronological order.

### A. Defendant Dana Weldon, LPN

As detailed above, on the evening of October 29, 2000, Ms. Mata sought medical attention because she was suffering from severe chest pain. In response to her complaints of chest pain, Ms. Weldon, the nurse on duty at the PMC, told Ms. Mata there was *nothing* she could do for her since the infirmary was closed. Ms. Weldon notified Ms. Mata that her sole recourse was to return to sick call the following morning. In other words, Ms. Weldon neither administered first aid nor summoned medical assistance despite Ms. Mata's plea for medical attention.

-17-

The district court granted summary judgment for Ms. Weldon, concluding Ms. Mata had produced no evidence that a medical assessment from her would have differed in any way from the one performed by Ms. Quintana the next morning. To the contrary, we conclude on this record that Ms. Mata provided evidence supporting an inference that Ms. Weldon knew about and disregarded a substantial risk to Ms. Mata's health.

The fact that Ms. Mata was "assessed" by another nurse the morning after she sought medical attention from Ms. Weldon is irrelevant to Ms. Mata's cause of action against Ms. Weldon. Events occurring subsequent to Ms. Weldon's complete denial of medical care to Ms. Mata have no bearing on whether Ms. Weldon was deliberately indifferent *at the time* she refused to treat Ms. Mata. It makes no sense to say that Ms. Mata would have had a valid claim against Ms. Weldon if no one ever came to her rescue, but she does not if she was fortunate enough to have someone assist her several hours after Ms. Weldon refused to provide her any medical attention. Ms. Weldon could not know whether an assessment would be performed on Ms. Mata the next morning. She also could not know what an assessment performed the following morning would reveal concerning Ms. Mata's medical condition. Therefore, any assessment of Ms. Mata's condition conducted several hours after her encounter with Ms. Weldon is irrelevant to whether Ms. Weldon knew of and disregarded an excessive risk to

Ms. Mata's safety. *Cf. Boretti*, 930 F.2d at 1154-55 (prisoner's treatment of his own wound, and the wound's healing without infection, did not undermine prisoner's Eighth Amendment claim; prisoner's needless suffering from pain when relief was available was sufficient to show deliberate indifference).

What is significant is that the evidence presented to the district court supports the conclusion that Ms. Weldon was in fact aware Ms. Mata was suffering from severe chest pains and required medical attention. Ms. Mata personally reported as much to Ms. Weldon. More importantly, Ms. Weldon refused to perform her gatekeeping role in a potential cardiac emergency by not seeking a medical evaluation for Ms. Mata from either a physician, physician assistant, or nurse practitioner as required by both the Colorado Department of Correction's CLINICAL STANDARDS AND PROCEDURES FOR HEALTH CARE PROVIDERS and well-established standards of nursing care.

The "Cardiology Health Care Services" section on chest pain in the DOC's CLINICAL STANDARDS AND PROCEDURES FOR HEALTH CARE PROVIDERS, dated January 2000, provides:

> IV. Procedure
>     A. Chest Pain: . . . .
>         2. *Acute cardiac disease is the greatest single, potentially correctable, cause of death within the department's population* and therefore, patients must be carefully screened to prevent missing a diagnosis.
>         . . . .
>         4. Unstable angina management is a frequent and potentially

lethal patient problem. Therefore, *patients presenting for evaluation of chest pain or other symptoms possibly representing myocardial ischemia*:

    a. *Will have an EKG performed and* will have an *official reading* of the EKG *obtained.*

    b. *Will be evaluated onsite by either the **provider** onsite or the on-call mid-level **provider**.*

5. *The only exception to the above would be patients who are transported to a hospital immediately* because of the severity of their presenting symptoms and signs. If there is any doubt whether the patient is having a myocardial infarction, transport them to the hospital.

6. Either the facility physician or physician on-call will be advised of the disposition of the cases being evaluated for chest pain by the nursing staff or the mid-level provider.

Aplt. App. at 200-02 (emphasis added). Health Care **Providers** are defined in the protocol as: **physicians, physician assistants, and nurse practitioners**. *Id.* at 201. Ms. Weldon, as an LPN, was plainly not a "provider" within the meaning of these protocols. She was instead a gatekeeper required to notify either a physician, physician assistant, or nurse practitioner of Ms. Mata's chest pain.

This gatekeeper requirement was further established by Ms. Mata's expert affidavits regarding Ms. Weldon's complete denial of medical treatment to Ms. Mata:

This constitutes a gross abdication of duty and responsibility, and a gross deviation from standards of nursing care . . . . [including] the very well-know[n] standard of nursing care (for both L.P.N.s and R.N.s) [which] *requires that any complaint of chest pain be treated as a major medical emergency until such time as cardiac involvement has been ruled out by a physician, physician's assistant or nurse practitioner*.

-20-

Aplt. App. at 251-59 (Aff. of Marie McCall, RN) (emphasis added); *see also id.* at

243-49 (Aff. of Sandra M. Mendenhall, LPN) (making essentially same points).

As this court has held:

> . . . deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment . . . . If . . . the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.

*Sealock*, 218 F.3d at 1211.

Ms. Weldon argues that a violation of "internal procedures" does not clearly

establish that a constitutional right has been violated. While published

requirements for health care do not create constitutional rights, such protocols

certainly provide circumstantial evidence that a prison health care gatekeeper

knew of a substantial risk of serious harm.[5] *See Howell v. Evans*, 922 F.2d 712,

---

[5]The dissent claims that Ms. Mata failed in her burden to raise a fact issue with respect to whether Ms. Weldon was subjectively aware of a substantial risk of harm to Ms. Mata. We disagree. Ms. Mata presented evidence that Ms. Quintana, an LPN with the Department of Corrections who worked with Ms. Weldon, knew about the protocals. Aplt. App. at 197-98 (Dep.of Donna Quintana)("Q. Are you supposed to call the physician if you're unable to relieve the chest paint? A. I believe in our new protocols, yes. . . . I probably would have, even if it wasn't in the protocol."). Ms. Mata also presented evidence from two professional nurses that "It is an extremely well-known standard of care and practice for L.P.N.'s that any complaint of chest pain be viewed as a major

(continued...)

-21-

719 (stating that "contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care"), *vacated after settlement by* 931 F.2d 711 (11th Cir. 1991), *but noted as reinstated in Howell v. Burden*, 12 F.3d 190, 191 n.* (11th Cir. 1994).

Ms. Weldon also argues that granting summary judgment in her favor was appropriate because she was similarly situated to the defendant Huber in *Sealock*. We disagree. First, unlike defendant Huber, Ms. Weldon does not contend she was unaware severe chest pain is a cardiac symptom or a serious medical condition. *Sealock*, 218 F.3d at 1212 n.7. Moreover, the DOC protocol mandating that Ms. Weldon treat severe chest pain as a cardiac symptom constitutes circumstantial evidence of her knowledge of the seriousness of such pain. The protocol states unequivocally that chest pain is a potential symptom of "acute cardiac disease," which "is the greatest single, potentially correctable, cause of death within the department's population." Aplt. App. at 200-02. There was no indication in *Sealock* that the court was presented with any such evidence, either because the plaintiff failed to introduce protocols as circumstantial evidence of defendant

[5](...continued)
medical emergency until such time as cardiac involvement has been ruled out by a physician, physician assistant, or nurse practitioner." Aplt. App. at 245 (Aff. of Sandra M. Mendall, LPN; Aplt App. at 252-53 (Aff. of Marie McCall, RN)(making same point). It is a reasonable inference from this evidence that Ms. Weldon, a trained LPN, was as aware as Ms. Quintana of the protocols and their requirments regarding severe chest pain.

Huber's knowledge that chest pains are a serious cardiac symptom, or because the events at issue in *Sealock* transpired before the DOC protocols at issue here were published. *Compare Sealock*, 218 F.3d at 1207-09 (describing events of *Sealock* as taking place in late January 1996) *with* DOC's CLINICAL STANDARDS AND PROCEDURES FOR HEALTH CARE PROVIDERS, "Cardiology Health Care Services," Aplt. App. at 200-02 (dated January 2000).

In addition, unlike defendant Huber, Ms. Weldon did not simply misdiagnose Ms. Mata; rather, she completely refused to assess or diagnose Ms. Mata's medical condition at all by, for instance, taking her blood pressure, listening to her heart with a stethoscope, and performing a cardiac work-up. Instead, Ms. Weldon completely refused to fulfill her duty as gatekeeper in a potential cardiac emergency. Defendant Huber, by contrast, did refer the *Sealock* prisoner to a physician assistant for medical treatment. *Id.* at 1208.

Similar to the physician assistant in *Sealock*, if Ms. Weldon "knew that appellant had unexplained chest pain, it would have been more than mere 'malpractice' or 'negligence' to fail to call an ambulance" or contact qualified medical personnel that could properly assess and assist Ms. Mata. *Id.* at 1211. The fact that Ms. Mata's heart attack did not occur until after the October 30 EKG does not defeat her claim. As a result of Ms. Weldon's absolute failure to follow the required protocols, contact the appropriate medical personnel, and/or attempt to

assist Ms. Mata in any fashion, there is evidence Ms. Mata had to endure unnecessary pain and suffering for several additional hours that did not "serve any penological purpose." *Estelle*, 429 U.S. at 103.[6]

In sum, Ms. Mata raised an issue of material fact with respect to Ms. Weldon on the subjective element of deliberate indifference. She produced evidence via her own affidavit and deposition testimony that Ms. Weldon knew she was suffering severe chest pains. Moreover, her expert affidavits coupled with the DOC's published requirements for health care suggest both that Ms. Weldon knew severe chest pain posed a serious risk to Ms. Mata's health and that Ms. Weldon's conduct was reckless under acceptable medical norms. Since Ms. Mata produced evidence that Ms. Weldon was aware of Ms. Mata's medical condition as well as the seriousness of unexplained severe chest pain on the evening of October 29, a jury could reasonably find that Ms. Weldon's alleged inaction on that date demonstrated deliberate indifference to Ms. Mata's serious medical needs.

### B. Defendant Amy Hough, RN

Ms. Mata returned to the infirmary as directed by Ms. Weldon on the

---

[6]Ms. Mata also produced expert evidence that had Ms. Weldon referred her to a physician as required by medical standards, it was "highly likely" that routine additional testing would have disclosed myocardial ischemia. Such a disclosure would have prompted cardiac catheterization and angioplasty, which might have entirely prevented Ms. Mata's heart attack and resulting permanent heart damage. Aplt. App. at 265-66 (Aff. of Dr. Levene).

morning of October 30, with continuing complaints of severe chest pain. Ms. Quintana was the nurse on duty that morning. It is undisputed that Ms. Mata informed Ms. Quintana she had been suffering from severe chest pain since the evening of October 29, and her pain registered an "eight" in severity on a scale of zero to ten. In response to Ms. Mata's complaints, Ms. Quintana administered an EKG, which the machine printout "read" as normal. Ms. Quintana then provided Ms. Mata with a "lay-in," or permission slip, excusing her from work and other prison duties for the duration of the day. Judge Baldock, joined by Judge Hartz, address below Ms. Mata's claim against Ms. Quintana.

Ms. Mata returned to the infirmary once more on the morning of October 31 at approximately 6:00 a.m. and informed Ms. Hough, a registered nurse, that "[her] chest was just killing [her] and that [she] could hardly breathe." Aplt. App. at 185. In response, Ms. Hough instructed Ms. Mata to return at 7:00 a.m. when regular infirmary hours began. When Ms. Mata returned sometime after 7:00 a.m., Ms. Hough took Ms. Mata's vital signs and performed an EKG, which Ms. Hough "read" as normal. The computerized interpretation of the EKG, however, actually read "abnormal changes possibly due to myocardial ischemia." Aplt. App. at 232. After performing the EKG, Ms. Hough reported Ms. Mata's chest pain to Ms. Saiz, a nurse practitioner, who had just arrived at the infirmary. Ms. Saiz then performed an independent assessment.

-25-

The district court concluded that Ms. Hough's actions failed to show deliberate indifference to plaintiff's serious medical needs. We agree. Unlike Ms. Weldon, Ms. Hough fulfilled her gatekeeper duty by reporting Ms. Mata's symptoms to a nurse practitioner in accordance with the DOC protocol for chest pain. The district court therefore correctly concluded that Ms. Hough was not deliberately indifferent to Ms. Mata's serious medical needs and was entitled to summary judgment on Ms. Mata's Eighth Amendment claims.

### C. Defendant Judy Saiz, NP

After performing an independent assessment of Ms. Mata, Ms. Saiz determined and informed Ms. Mata that her EKG was normal and that she was suffering from a chest lining inflammation. Nevertheless, Ms. Saiz faxed a copy of the EKG to Joseph Wermers, MD, a physician who was working at another DOC facility on the morning of October 31. After reviewing the EKG printout, Dr. Wermers determined that the second EKG showed an abnormal change from the EKG of October 30, and that Ms. Mata should be hospitalized to determine whether she had sustained a heart attack. He instructed Ms. Saiz to send Ms. Mata immediately to the emergency room. Ms. Saiz then instructed Ms. Mata to return to her unit to change into "full greens" for her trip to the hospital. After Ms. Mata had done so, she returned to the main prison facility. Thereafter, she was transported to the Parkview Hospital emergency by prison personnel.

The district court correctly granted summary judgment for Ms. Saiz with respect to her actions before she instructed Ms. Mata to return to her unit. Although Ms. Mata produced evidence that Ms. Saiz knew she was suffering severe chest pains and that severe chest pain posed a serious risk to Ms. Mata's health, Ms. Mata failed to show Ms. Saiz was deliberately indifferent to her serious medical needs. Like defendant Hough in *Sealock*, Ms. Saiz fulfilled her gatekeeper duty by faxing Ms. Mata's EKG printout to a physician in accordance with the DOC protocol for chest pain.

**BALDOCK, J.,** joined by **HARTZ, J.,** as to Defendant Quintana.

### D. *Defendant Donna Quintana, LPN*

Finally, we address the district court's grant of summary judgment to Nurse Quintana. We assume Ms. Mata satisfies the objective prong of the deliberate indifference test as to Ms. Quintana because she undoubtedly fails to satisfy the test's subjective prong. Nothing in the record suggests Nurse Quintana was *consciously* aware of a serious medical risk to Ms. Mata and disregarded that risk. *See Farmer*, 511 U.S. at 839. When Ms. Mata visited the infirmary on the morning of October 30, 2000, she told Nurse Quintana about her chest pains. Ms. Quintana checked Ms. Mata's pulse and performed an EKG which produced normal results. Ms. Quintana also noted in Ms. Mata's chart that she denied

-27-

having any pain in her arm, her color was normal, and her lungs were clear. At that moment, no indication existed that Ms. Mata was subject to serious medical risk. In fact, Ms. Mata told Ms. Quintana "I think I'm going to be okay." Nurse Quintana informed Ms. Mata she had "worked in coronary for seven years, and [Ms. Mata] was not having a heart attack." Ms. Quintana gave Ms. Mata a twenty-four hour lay-in slip, which allowed Ms. Mata to rest for the day. Ms. Quintana also indicated in Ms. Mata's medical chart that she instructed Ms. Mata to return to the infirmary if her pain worsened.

Nurse Quintana's statement that Ms. Mata "was not having a heart attack" and her notes in Ms. Mata's medical chart indicating she told Ms. Mata to return if the pain worsened provide direct insight into Nurse Quintana's subjective state of mind. Nurse Quintana's statement and notes demonstrate she *subjectively* believed Ms. Mata was *not* having a heart attack and her chest pain had been relieved. Ms. Mata told her as much when Ms. Mata stated she thought she was "going to be okay." In her dissent, Judge Seymour makes much of Nurse Quintana's after-the-fact acknowledgment that protocols require her to call a doctor in the case of "severe chest pain." Nothing in the record suggests, however, Nurse Quintana believed Ms. Mata was suffering "severe chest pain," when she released her, thereby *consciously* disregarding a *known* medical risk to Ms. Mata. *See Farmer*, 511 U.S. at 837. Rather, the evidence demonstrates Nurse Quintana subjectively

believed: (1) Ms. Mata's chest pain had been relieved; (2) Ms. Mata was not suffering from a heart attack or other serious medical condition; (3) Ms. Mata, according to her own statement, was going to be "okay"; and, (4) Ms. Mata did not need a physician. Ms. Quintana testified as much when she stated "I would not have sent [Ms. Mata] out if her chest pain had not been relieved."

The record simply does not demonstrate Nurse Quintana acted with deliberate indifference towards Ms. Mata's medical needs. *See Gross v. Pirtle*, 245 F.3d 1151, 1155-56 (10th Cir. 2001) (noting the record must demonstrate plaintiff has satisfied her "heavy" burden of overcoming a qualified immunity defense). To the contrary, the record shows Ms. Quintana made a good faith effort to diagnose and treat Ms. Mata's medical condition. No reasonable jury could conclude Nurse Quintana acted with deliberate indifference to Ms. Mata's medical needs based on the record before us. The district court correctly concluded Nurse Quintana was entitled to qualified immunity and properly granted her summary judgment on Ms. Mata's Eighth Amendment claim.

The judgment of the district court is **AFFIRMED** with respect to Ms. Quintana, Ms. Hough, and Ms. Saiz, **REVERSED** with respect to Ms. Weldon, and **REMANDED** for further proceedings in accordance with this opinion.

No. 03-1247, *D. Mata v. Saiz, et al.*

**SEYMOUR, J.**, dissenting as to defendant Quintana.

Because I disagree with the majority's legal analysis and conclusion

regarding defendant Quintana, I respectfully dissent. As explained above, on the

morning of October 30, Ms. Mata returned to the infirmary as directed by Ms.

Weldon, with continuing complaints of severe chest pain. Ms. Mata informed Ms.

Quintana, the nurse on duty, that she had been suffering from severe chest pain

since the evening of October 29, and that her pain registered an "eight" in severity

on a scale of zero to ten. Ms. Quintana administered an EKG, which the machine

printout "read" as normal. She then provided Ms. Mata with a "lay-in," or

permission slip, excusing her from work and other prison duties for the duration of

the day.[1]

The district court granted summary judgment for Ms. Quintana, holding that

deliberate indifference requires more than a showing of failure to provide the

proper standard of care. I would reverse that decision. While it is true that "a

prisoner who merely disagrees with a diagnosis or a prescribed course of treatment

does not state a constitutional violation," *Perkins v. Kansas Dep't of Corrs.*, 165

---

[1]Ms. Quintana contends, and the district court accepted as true, that she also instructed Ms. Mata to return to the infirmary if her pain persisted. This fact, however, is controverted. When queried directly in her deposition, Ms. Mata responded that Ms. Quintana had never advised her to return for treatment should her pain persist. Aplt. App. at 110. In reviewing the district court's grant of summary judgment, we are obligated to view the facts in the light most favorable to Ms. Mata.

F.3d 803, 811 (10th Cir. 1999) (citations omitted), this is not a case of mere disagreement between the parties. *See Oxendine v. Kaplan*, 241 F.3d 1292, 1277 n.7 (10th Cir. 2001); *accord Hunt v. Uphoff*, 199 F.3d 1220, 1223-24 (10th Cir. 1999) (prisoner's claim he was denied adequate and timely medical assistance does not reflect "mere disagreement with his medical treatment" and "the fact that he has seen numerous doctors [does not] necessarily mean that he received treatment for serious medical needs, *i.e.*, that treatment was prescribed at all or that prescribed treatment was provided"). Ms. Mata's argument is not that Ms. Quintana was negligent or committed medical malpractice, but rather that she recklessly deviated from acceptable medical norms by denying her "access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000); *Ramos v. Lamm*, 639 F.3d 559, 575 (10th Cir. 1980); *see also* note 2 *supra* (opinion of Seymour, J.). Ms. Mata has proffered facts supporting an inference that Ms. Quintana knew about and disregarded a substantial risk to Ms. Mata's health.

Ms. Mata's evidence demonstrates that: she informed Ms. Quintana she was suffering severe chest pains; Ms. Quintana performed an EKG because she knew severe chest pains were a cardiac symptom; as an LPN, Ms. Quintana was not

qualified to read an EKG;[2] a "normal" EKG does not necessarily rule out an

impending heart attack;[3] well-established standards of nursing care and the DOC

---

[2]The "Most Frequently Asked Scope of Practice Q & A's" provided by the Colorado Department of Regulatory Agencies states:

> The placing of leads and performing an EKG is within the scope of practice of an LPN, however, *reading or interpreting the results of an EKG are not within the scope of an LPN*. CRS 12-38-117(1)(c) gives the Board statutory authority to discipline any nurse upon evidence that the person has willfully or negligently acted in a manner inconsistent with the health or safety of a person under his care.

Aplt. App. at 221 (emphasis added).  *See also* Aplt. App. at 255 (Aff. of McCall) ("Under no recognized standard of nursing practice, anywhere, is an L.P.N. *ever* authorized to [interpret an EKG]."); *id.* at 247 (Aff. of Mendenhall) (same).

[3]Not all serious heart conditions are detected by an EKG, also known as an ECG:

> The electrocardiogram is essentially a screening test.  It gives us a piece of the whole cardiac picture, but only occasionally – as in an acute heart attack or rhythm disturbance – the definitive piece.  Like all tests, *it has limitations and pitfalls*.  It must be interpreted within the context of these, which requires, *expertise and experience*.
>
> *Some heart problems may go undetected by the ECG*.  Someone who has had a prior heart attack may develop a normal electrocardiogram over time.  Some parts of the heart may not be electrically visible on the ECG; *even during an acute heart attack, an ECG may appear normal*.  Many people ask about their ECG, perhaps under the impression that a normal ECG means a healthy heart, but *a normal ECG can hide a heart problem*, just as apparent abnormalities may simply indicate variations of normal.  With an ECG, shades of grey are common; it is like viewing scenery without your eyeglasses.

ROB MYERS, MD, HEART DISEASE: EVERYTHING YOU NEED TO KNOW 41 (2004) (emphasis added).

> Like any other test result, ECG results are not always 100 percent accurate.  Some rhythm disorders are so complex that they can't be diagnosed with certainty without further testing.  The ECG may occasionally suggest coronary artery disease when other testing shows no coronary artery

(continued...)

-3-

protocols require that a person suffering from chest pain have an official EKG reading and on-site medical evaluation performed by either a physician, physician assistant, or nurse practitioner; Ms. Quintana acknowledged in her deposition testimony that under the DOC protocols she is supposed to call a physician in cases of severe chest pain, Aplt. App. at 197-98; and Ms. Quintana failed to seek the appropriate specialized medical assistance that Ms. Mata's condition demanded. This evidence is sufficient to satisfy the subjective element of the deliberate indifference test for purposes of defeating a motion for summary

---

[3](...continued)
disease. *The ECG may appear normal when you do have such disease –* particularly if you aren't showing any symptoms when you have the ECG . . . . *One of the problems with traditional ECGs is that because they are performed over only a minute or so, some sporadic rhythm abnormalities or other problems may be missed.*
MAYO CLINIC HEART BOOK: THE ULTIMATE GUIDE TO HEART HEALTH 240 (Bernard J. Gersh, ed., 2d ed. 2000) (emphasis added); *see also* J. WILLIS HURST, INTERPRETING ELECTROCARDIOGRAMS: USING BASIC PRINCIPLES AND VECTOR CONCEPTS 98 (2001) ("The clinician must . . . know the limitation[s] of the [EKG]. For example, *the clinician must know the types of heart disease that can be present when the electrocardiogram is normal.*") (emphasis added).
    The fact that patients with a normal EKG reading sometimes suffer from serious heart problems explains the rationale for (1) the regulation prohibiting LPNs from reading or interpreting the results of an EKG/ECG and (2) the protocol requiring LPNs to immediately send patients who are experiencing severe chest pain or angina to a "heatlh care provider," *i.e.*, a physician, physician assistant or a nurse practitioner, for a medical evaluation. Aplt. App. at 221 ("reading or interpreting the results of an EKG are not within the scope of an LPN"); *id.* at 200-02 ("patients presenting for evaluation of chest pain . . . [w]ill be evaluated onsite by either the [health care] provider on site or the on-call mid-level [health care] provider").

judgment.

Ms. Quintana, like Ms. Weldon, contends that granting summary judgment in her favor was appropriate because she is similarly situated to defendant Huber for whom summary judgment was affirmed in *Sealock*. But there are critical differences between Ms. Quintana and defendant Huber. First, while there was no evidence in *Sealock* that defendant Huber knew unexplained chest pain posed a serious medical risk, there is evidence here that Ms. Quintana was subjectively aware of the seriousness of chest pain. According to the court in *Sealock*, "Huber stated . . . that she did not consider the chest pain to be a cardiac symptom"; rather, she believed the defendant had contracted the flu. *Sealock*, 218 F.3d at 1208, 1212 n.7. "Thus . . . she at most made a misdiagnosis." *Id*. at 1212 n.7. Unsurprisingly, Ms. Quintana makes no such claim in this case. She conceded in her deposition testimony that she is familiar with the DOC protocol for chest pain, Aplt. App. at 197-98, which describes chest pain as a potential symptom of "acute cardiac disease." *Id.* at 201-02. In addition, if she did not believe chest pains were a cardiac symptom, there would have been no plausible reason to perform an EKG.

Second, Ms. Quintana acknowledged that the DOC protocols required her to seek specialized medical treatment for Ms. Mata under the circumstances, while no such evidence was presented in *Sealock* concerning defendant Huber's subjective

knowledge of proper medical procedures. We gave no indication in *Sealock* that protocols were introduced as circumstantial evidence of defendant Huber's knowledge that chest pains are a serious cardiac symptom. The events at issue in *Sealock* appear to have transpired before publication of the DOC protocols that pertain to this case.

Finally, while the evidence suggests Ms. Quintana recklessly abdicated her duty as a gatekeeper by refusing to contact anyone qualified to assess Ms. Mata, defendant Huber in *Sealock* actually did refer the prisoner to a physician assistant within two hours of the prisoner's complaints of chest pain. *Sealock*, 218 F.3d at 1208. In sum, Ms. Mata presented evidence that Ms. Quintana was aware of the severity of her chest pain and knew that such pain posed a serious risk to Ms. Mata's health. "Failure to summon [qualified medical personnel or] an ambulance would have disregarded that risk, arguably constituting deliberate indifference to a serious medical need." *Id.* at 1211-12.

For the aforestated reasons, I dissent from the majority's decision to affirm the district court's dismissal of Ms. Mata's claim with regard to defendant Quintana.

No. 03-1247, D.Mmata v. Saiz, et al.

**BALDOCK, J.**, Circuit Judge, dissenting in part.

Today a two-judge majority sweeps away twenty-five years of binding precedent as "dicta" and effectively relieves a prisoner claiming deliberate indifference to her medical needs of the burden of satisfying the objective prong of the deliberate indifference test, *i.e.*, the burden of showing the deprivation of a medical need "'*so obvious that even a lay person would easily recognize the necessity for a doctor's attention.*'" Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (emphasis added) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)); accord Olsen v. Layton Hills Mall, 312 F.3d 1304, 1315 (10th Cir. 2002); Garrett v. Stratman, 254 F.3d 946, 949 (10th Cir. 2001); Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001); Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). According to the panel, with nary a citation to authority:

> When delay by prison employees results in damage to a prisoner's heart, the question raised by the objective prong of the deliberate indifference test is whether the alleged *harm* (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious (as argued by Judge Baldock).

Court's Op. at 12 (emphasis added).

By relying on hindsight rather than focusing on a prisoner's condition as it would appear to a lay person at the time medical assistance was sought, the panel eliminates the objective prong from the deliberate indifference test.

Harm is a precursor to *every* deliberate indifference claim worth its weight. Indifference does not relate to how a situation might have been handled differently in hindsight. At the outset, indifference relates to a prisoner's situation at a particular point in time and what measures, if any, are warranted to address that situation. Under the panel's view of the law, a prisoner who complains of a headache, receives aspirin, and later has a brain aneurism has satisfied the objective prong of the deliberate indifference test. That cannot be the law. Because this panel has expanded our Eighth Amendment jurisprudence well beyond its narrowly defined scope, I dissent.

I.

To satisfy the objective prong of the Eighth Amendment's deliberate indifference test, the law requires a prisoner to demonstrate that prison officials failed to address a "sufficiently serious medical need." See, e.g., Hunt, 199 F.3d at 1224. Consistent with heightened standards for constitutional liability, the *need* must be *obvious*. We have *repeatedly* defined a sufficiently serious medical need as one so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See supra at 1. In other words, the test's objective prong asks whether a lay person would have recognized a prisoner's medical need as sufficiently serious based upon the circumstances presented to the prison official. See, e.g., Olsen, 312 F.3d at 1316 (addressing whether a panic attack was

2

sufficiently serious to warrant medical attention); Oxendine, 241 F.3d at 1278 (addressing whether "blackening and necrifying tissue" of reattached finger was sufficiently serious to warrant medical attention). Only if the answer to that inquiry is yes do we inquire into the prison official's state of mind.

The subjective prong of the deliberate indifference test asks whether the prison official consciously disregarded a substantial risk of harm to the prisoner. See Farmer v. Brennan, 511 U.S. 825, 837-39 (1994). Only if the prisoner satisfies both prongs of the test, *and* the official's inaction results in substantial harm to the prisoner, does such inaction constitute the infliction of cruel and unusual punishment redressable under the Eighth Amendment. We explained this settled state of the law in Oxendine:

> [T]o properly set forth an Eighth Amendment claim . . . [the prisoner] must set forth facts demonstrating [1] that his alleged medical need, in this case the need for an outside medical specialist, was sufficiently serious to meet the objective element of the deliberate indifference test, *and* [2] that the Defendants' delay in meeting that need caused him substantial harm. Finally, to meet the subjective element of the deliberate indifference test, [the prisoner] must [set forth] facts supporting an inference [3] that Defendants knew about and disregarded a substantial risk of harm to his health or safety.

241 F.3d at 1276-77 (emphasis added).

## II.

After today, I am at best uncertain as to the state of the law in this Circuit. That portion of the panel's opinion quoted above from page twelve plainly states a

3

prisoner need only show a delay in medical care caused substantial harm to meet the objective prong of the deliberate indifference test. Yet, after concluding a prisoner's symptoms have no bearing upon the objective prong of the test (it's the harm that counts), the panel retreats and goes to great lengths to conclude Ms. Mata's complaint of chest pains *alone* established a sufficiently serious medical need under the test's objective prong. See Court's Op. at 14-15. The panel appears in a quandary. For just as I can find no prior case which holds harm *alone* may satisfy the objective prong of the deliberate indifference test, I can find no prior case which holds chest pain *alone* satisfies the objective prong of the test.

The Court's reliance upon our decision in Sealock, 218 F.3d at 1205, to support the latter proposition is misguided. In Sealock, an opinion in which I joined, the prisoner exhibited symptoms *far beyond* chest pain. Not only was the prisoner experiencing severe chest pains, but "[h]e was sweating so heavily that his bed and clothing were soaked." Id. at 1207. Prison officials "observed that [the prisoner] was sweating, vomiting, and appeared very pale." Id. at 1208. The prisoner told officials "he had a crushing pain in his chest, he had trouble breathing, and had been vomiting all night." Id. After several hours, the prisoner finally was taken to the infirmary where he complained of chest pain, throat pain, nausea, vomiting, and breathing difficulties. Id. Based on those facts we held the prisoner satisfied the objective prong of the deliberate indifference

4

test by showing his medical needs were so obvious that even a lay person would have easily recognized the need for a doctor. Id. at 1210.

Of course, the symptoms Ms. Mata exhibited to Nurse Weldon in this case were far fewer and less severe than those exhibited to officials in Sealock. In fact, Ms. Mata complained of a single symptom to Nurse Weldon–chest pain. Unlike the prisoner in Sealock, absolutely nothing in the record suggests Ms. Matta was suffering from any symptom other than chest pain when she visited Nurse Weldon on the evening of October 29, 2000. The record suggests Ms. Mata simply left the infirmary after Ms. Weldon told her it was closed. Ms. Mata left without objection, did not insist she be evaluated, and did not complain of chest pains to anyone else that night. In fact, Ms. Mata stated that after she left the infirmary, she went back to her bed and just "laid there." Ms. Mata's complaints of chest pain, without more, would not have indicated a serious cardiac problem that was *obvious* to a reasonable lay person.

This is because, more often than not, chest pains are *not* indicative of a serious cardiac problem. See Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999) (noting a "lay person" would not consider complaints of "chest pains" serious enough to require a doctor's care or attention because such complaints, "objectively speaking, are relatively minor"). For example, the American Medical Association broadly describes the term "chest pain" as any "pain that occurs in the

area between the neck and the bottom of the rib cage." American Medical Association's Complete Medical Encyclopedia 24 (2003). An assortment of maladies might be the source of "chest pain," including asthma, stomach ulcers, gastroesophageal reflux disease, anxiety or pneumonia. Id. at 348-49. Chest pain may also originate from a host of organs including the heart, lungs, esophagus, muscles, ribs, tendons, or nerves. Id.

Simply stated, "not all chest pain signals a heart attack, nor does every heart attack cause chest pain." Id. at 349. In his deposition, Dr. Jack Boerner stated "there are many cases of chest pain that have other apparent causes that wouldn't require immediate evaluation looking for a heart attack." Dr. Boerner also stated "I don't want to say that all patients . . . who have chest pain, require a physician's evaluation. Because I think that there are a large number of patients who have clearly non-cardiac cause for the pain." Under a proper view of the law, Ms. Mata has not shown she suffered from a sufficiently serious medical need on the night of October 29, 2000 that was *so obvious* even a lay person would have *easily* recognized the necessity for a doctor's attention.

III

Just as Ms. Mata failed to present evidence of a sufficiently serious medical need under the objective prong of the deliberate indifference test, she failed under the subjective prong of the test to present evidence showing Nurse Weldon was

6

subjectively aware of and disregarded a substantial risk of serious harm to her. The panel extensively relies on the Colorado Department of Correction's Clinical Standards and Procedures for Health Care Providers ("Protocols") to infer Nurse Weldon knew she was required to perform an EKG on Ms. Mata and summon a doctor when Ms. Mata complained of chest pain. According to the panel, the Protocols required Ms. Weldon, as a medical "gatekeeper," to notify either a physician, physician assistant, or nurse practitioner of Ms. Mata's chest pain. To the contrary, the Protocols do *not* require an EKG and doctor *in every instance* of chest pain. The Protocols only require that "patients presenting for evaluation of chest pain or other symptoms *possibly representing myocardial ischemia*" will have an EKG performed and will be evaluated by a provider (emphasis added).

Myocardial ischemia is a heart attack caused by the blockage of a coronary artery. Stedman's Medical Dictionary 895 (27th ed. 2000). Symptoms possibly representing myocardial ischemia include "crushing anterior chest pain radiating into the neck, shoulder, or arm, lasting more than 30 minutes." Id. "[T]ypically pain is accompanied by dyspnea, diaphoresis, weakness, and nausea." Id. In this case, Ms. Mata's complaint to Nurse Weldon was limited to chest pain. Ms. Mata did not complain of any pain in her neck, shoulder, or arms; nor did she complain of any nausea or breathing difficulties. Nurse Weldon simply was not presented with chest pain *possibly representing myocardial ischemia*. In fact, the evidence

7

shows Ms. Mata did not experience any myocardial ischemia until sometime between the morning of October 30, 2000, and the morning of October 31, 2000, well after her initial visit with Nurse Weldon.

Even assuming the Protocols required an EKG and doctor in every instance of chest pain (which they do not), absolutely nothing in the record suggests Ms. Weldon was consciously aware of the Protocols and violated them.[1] "[A]n official's failure to alleviate a significant risk that [s]he should have perceived *but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838 (emphasis added). The panel relies on the negative inference that "Ms. Weldon does not contend she was unaware severe chest pain is a cardiac symptom or a serious medical condition." Court's Op. at 22. The panel's inference, however, inverts the proper burden of proof for qualified immunity purposes. Ms. Mata bears the burden to show Nurse Weldon violated her constitutional rights. See Nelson v. McMullen, 207 F.3d

---

[1] The panel's attempt to analogize Nurse Weldon's inaction with that of the physician assistant in Sealock is misplaced. The physician assistant in Sealock acknowledged he was obligated to call an ambulance and procure treatment for the patient if the patient was experiencing unexplained chest pain. We concluded that "[i]f Havens did know about the chest pain, *by his own testimony*, he may have been deliberately indifferent in failing to summon an ambulance." Sealock, 218 F.3d at 1211 (emphasis added). The physician assistant's statement was relevant for purposes of the *subjective* prong because it provided direct insight into his state of mind. In contrast, nothing suggests Nurse Weldon understood that chest pain alone required her to summon help.

8

1202, 1206 (10th Cir. 2000) (noting once a defendant raises a qualified immunity defense, "the burden shifts to the plaintiff to meet a strict two-part test."). Ms. Mata fails to satisfy her burden because she has not shown Nurse Weldon *knew* of a substantial risk of harm and deliberately disregarded that risk.

I would affirm the judgment of the district court in all respects and specifically as to Nurse Weldon.