**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 1, 2011**

Elisabeth A. Shumaker
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

TAMIKA COLBERT, Parent of
T.D.S., for and on behalf of T.D.S.,
a Minor, and in her individual
capacity,

   Plaintiff-Appellant,

v.

THE BOARD OF COUNTY
COMMISSIONERS FOR
OKLAHOMA COUNTY, a political
subdivision,

   Defendant-Appellee,

and

LAWRENCE E. HICKS, in his
individual and official capacities as
Director of the Oklahoma County
Juvenile Bureau; WILLIAM B.
SWEAT, in his individual and official
capacities as Facility Administrator for
the Oklahoma County Detention
Center; D. DESMUKE, in her
individual capacity as a Correctional
Officer,

   Defendants.

No. 10-6145
(D.C. No. 5:08-CV-01216-HE)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

[*]  After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral

(continued...)

Before **KELLY** and **BALDOCK**, Circuit Judges, **BRORBY**, Senior
Circuit Judge.

Acting on behalf of her minor son, Tamika Colbert brought suit under
42 U.S.C. § 1983 against the Board of County Commissioners for Oklahoma
County (the County).[1]  She claimed the County violated T.D.S.'s constitutional
rights when it failed to adequately protect him from harm and acted with
deliberate indifference to his serious medical needs while he was in custody at the
Oklahoma County Juvenile Detention Center (the Center).  Ms. Colbert appeals
from the district court's grant of summary judgment in favor of the County.  We
have jurisdiction under 28 U.S.C. § 1291, and we affirm on the failure-to-protect
claim and reverse on the deliberate-indifference claim.

[*](...continued)
argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]      Ms. Colbert originally named as defendants: Lawrence E. Hicks, the
Director of the Oklahoma County Juvenile Bureau; William B. Sweat, the
Administrator of the Oklahoma County Juvenile Detention Center; and
D. Desmuke, a correctional officer.  She voluntarily dismissed these defendants.
Also, Ms. Colbert brought suit not only on behalf of T.D.S., but individually as
well.  However, she never developed any individual claims and, like the district
court, we deem them abandoned.

I.

The material facts are, for the most part, undisputed. T.D.S. was fifteen years old when he was arrested on April 7, 2008, and detained at the Center. Upon admission, he was examined by a nurse, who pronounced him healthy. But T.D.S. began experiencing health problems on the evening of April 10. He twice complained of a headache and dizziness and asked for Tylenol. His complaints, however, came after the time when anyone other than a supervisor could authorize opening his cell, and he was advised to go to sleep.

The next morning, April 11, T.D.S. again complained of a headache and was given Tylenol. Although he participated in normal activities, a couple of hours later he asked for more Tylenol, which was denied because four hours had not elapsed since his previous dose. When T.D.S. did not eat his lunch and complained of nausea, a detention officer escorted him to his cell. A check conducted shortly thereafter revealed that he had spit up. He showered at around 5:30 p.m., and then asked to go to his room because he had a headache. He was served dinner in his cell, and received Tylenol at 7:30 p.m. T.D.S. asked for more Tylenol a couple of hours later, but because four hours had not elapsed, his request was denied.

When detention officers woke up T.D.S. at about 8:30 a.m. on April 12, he complained of a headache. About an hour later, he was taken to a room to meet

his mother, who had come for visitation.[2] According to Ms. Colbert, detention personnel initially told her that T.D.S. could not visit with her because he was sick and had been throwing up. But when she insisted on making sure her son was okay, they brought T.D.S. to the visitation room. She said that when they hugged, he was felt like he was burning up, and he had a knot on his head. T.D.S. told her that he fell out of bed and hit his head. She met with staff supervisor D. Desmuke about her son's condition. According to Ms. Colbert, Ms. Desmuke told her that she would make sure that T.D.S. saw the nurse, and promised to call her if anything else happened. Ms. Desmuke admitted meeting with T.D.S.'s mother, but denied seeing a knot on his head or promising he would see the nurse; instead, she said she told her that T.D.S. could fill out a request for medical care when he returned to his cell if he wanted medical attention.

The afternoon of April 12 passed without incident. That evening, however, T.D.S. did not eat his dinner and when he complained of nausea, a detention officer gave him some Tums and took him to his cell. Another detention officer said she thought she noticed a knot on T.D.S.'s head, but could not be certain. She said that T.D.S. told her that he fell when he woke up that morning. In any event, at about 9:30 p.m., when conducting her rounds, T.D.S. complained to the officer of nausea and dizziness, and she agreed to fill out a request for medical

---

[2] Parents are allowed to visit their children on Saturdays and Sundays. Availing herself of the first opportunity to visit her son following his arrest, Ms. Colbert came to the Center on Saturday morning, April 12.

attention on his behalf; however, she forgot to complete the request prior to leaving at 11 p.m., nor did she provide any information to the incoming shift about T.D.S.'s medical situation.

Ms. Desmuke was again the supervisor on duty the next day, April 13, when T.D.S. was discovered in his cell at about 8 a.m. by two detention officers.[3] One officer said that T.D.S.'s head was swollen, and he was covered in what appeared to be either vomit or feces. The officers woke up T.D.S. with some difficulty and observed that one side of his face seemed to sag as if he had suffered a stroke. He was non-verbal and non-responsive. They immediately called for Ms. Desmuke. Although there are conflicting accounts as to when Ms. Desmuke responded (somewhere between 8 and 9 a.m.), she did in fact look at T.D.S. and reported smelling feces and observing a large knot on his left forehead. What is undisputed is that Ms. Desmuke telephoned the on-call nurse on her cell phone at 9:12 a.m. The nurse's account of what she was told by Ms. Desmuke about T.D.S.'s condition and Ms. Desmuke's account of what she told the nurse are in conflict.

Ms. Desmuke related that the nurse was on her way to church. She claimed that she told the nurse that T.D.S. had a large knot on his head, was not talking

---

[3] These officers arrived at 7 a.m. Instead of checking the residents immediately upon their arrival as required by the Center's policy, they talked for several minutes and then cleaned some rooms. They did not make their way to T.D.S.'s cell until sometime between 7:45 and 8:00 a.m.

normally, and had defecated on himself. According to Ms. Desmuke, she urged the nurse to come to the Center to check on him as soon as she was able to do so. Although Ms. Desmuke believed T.D.S. should have been taken to the hospital by ambulance, she admitted that she did not mention this to the nurse or ask for permission to call an ambulance. The nurse prescribed an ice pack for his face and some Ibuprofen.

The nurse said that Ms. Desmuke told her nothing more than T.D.S.'s face was a little bit swollen and that he might have pink eye. According to the nurse, Ms. Desmuke did not give her any additional information about his condition, or convey an emergency. On the basis of what Ms. Desmuke told her about T.D.S.'s condition, she prescribed the ice pack and Ibuprofen, which he received at about 9:45 a.m.[4] T.D.S. was placed on a medical watch, which required detention officers to look through the window of his cell every ten minutes.

T.D.S. was asleep when two detention officers went to his cell to wake him for lunch. One officer observed a large puddle of what appeared to be vomit on the cell floor and said that T.D.S. was unable to talk. The officer immediately summoned Ms. Desmuke. Once again, it is unclear when these events took place, although the detention officer estimated it was likely around 12:45 p.m. when he

---

[4]    Although it is not entirely clear, there is some indication that the nurse did agree to come to the Center on her way home from church to examine T.D.S. The nurse, however, had not come to the Center when she was called for a second time at about 1 p.m.

summoned Desmuke. When she looked at T.D.S., Ms. Desmuke observed the vomit and said he was non-responsive. Ms. Desmuke telephoned the nurse at 12:57 p.m. During a three-minute conversation, Ms. Desmuke told the nurse that T.D.S. could not talk, was sweating, and had thrown up. She says that she told the nurse that he needed to go to the hospital, and the nurse authorized calling an ambulance.

Once again, the nurse related a somewhat different version of their second conversation. She claims that this was the first time that Ms. Desmuke informed her that T.D.S. had been vomiting and defecating on himself, which she understood had just occurred recently. According to the nurse, she instructed Ms. Desmuke to call an ambulance.

But instead of calling 911, Ms. Desmuke placed a telephone call to her boss, the Center's assistant administrator. The record reveals that they spent six minutes in conversation, during which time the assistant administrator said that Ms. Desmuke told her, among other things, about her telephone calls to the nurse and her belief that T.D.S. should have gone to the hospital a long time ago. At 1:07 p.m., Ms. Desmuke called for an ambulance. In the meantime, the assistant administrator called the facility administrator and told him that T.D.S. was being transferred by ambulance to a hospital due to an insect bite.

However, T.D.S. wasn't suffering from an insect bite; instead, he had a traumatic brain injury (left frontal sinus fracture), which has left him non-verbal

and non-ambulatory.  In addition to being fed intravenously, he breathes with the aid of a ventilator.  His condition is not expected to improve.

The district court held that a failure-to-protect claim requires, among other things, a sufficiently culpable state of mind, and because Ms. Colbert offered alternative theories as to how the injury occurred, she could not prevail on this claim.  As to her claim for deliberate indifference to a serious medical need, the court found that Ms. Desmuke "who was not a medical professional, may not have taken the ideal steps in response to the situation she encountered, but the proffered evidence does not suggest a basis for a finding that she acted, or failed to act, with deliberate disregard of T.D.S.'s circumstances."  Aplt. App., Vol. 1 at 210.  Finding no "constitutional violation," the court determined it was "unnecessary to analyze whether some county policy or custom could be said to have been the moving force behind the violation," *id*. at 210 n.19.

## II.

"We review a grant of summary judgment *de novo*, applying the same standard as the district court."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quotation omitted).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[5]  "A[] [dispute] is

5    Rule 56 has been recently amended, effective December 1, 2010.  The summary judgment standard previously enumerated in subsection (c) was moved
(continued...)

'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "A[] . . . fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.* "[W]e examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Sealock*, 218 F.3d at 1209 (quotation omitted).

## III.

We address first the claim of deliberate indifference to a serious medical need. As explained, in order to survive summary judgment, Ms. Colbert need not prove she will ultimately prevail; rather, she need only establish the existence of evidence from which a jury could reasonably return a verdict in her favor. She meets this burden.

"Under the Fourteenth Amendment due process clause, pretrial detainees are entitled to the degree of protection against denial [or delay] of medical attention which applies to convicted inmates under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir.) (quotation and ellipses omitted), *cert. denied*, 130 S. Ct. 259 (2009). "A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth

---

[5](...continued)
to subsection (a), and there was one word change from the previous version – genuine "issue" became genuine "dispute." Fed. R. Civ. P. 56 advisory committee note (2010 Amendments). But "[t]he standard for granting summary judgment remains unchanged." *Id.*

Amendment." *Sealock*, 218 F.3d at 1209. In particular, we are concerned with Ms. Desmuke's alleged unconstitutional delay in getting medical care for T.D.S.[6] "[A] delay in medical care . . . constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotation omitted). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id*. (quotation omitted). T.D.S.'s injuries are such that he has suffered "substantial harm."

"The test for constitutional liability of prison officials involves both an objective and a subjective component." *Id*. (quotation omitted). As to the objective component, "a medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. (quotation omitted). The County concedes that T.D.S.'s medical condition was sufficiently serious to meet the objective component.

---

[6]    Our cases also recognize that deliberate indifference exists where "a medical professional . . . fail[s] to treat a serious medical condition properly,"or where "the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and . . . he delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock,* 218 F.3d at 1211. Evaluating this type of deliberate indifference would involve an examination of the nurse's actions. Ms. Colbert, however, does not develop this theory; instead, she accepts the nurse's version that Ms. Desmuke failed to convey a serious medical condition.

Turning to the subjective prong, it "requires the plaintiff to present evidence of the prison official's culpable state of mind." *Id.* This prong "is satisfied if the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." *Id.* (quotation and brackets omitted). A plaintiff is not required to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Whether a prison official had knowledge of and disregarded a substantial risk of serious harm is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* Indeed, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* "This is so because if a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Mata*, 427 F.3d at 752 (quotation and brackets omitted).

Ms. Colbert has raised an issue of material fact with respect to Ms. Desmuke on the subjective prong of deliberate indifference. According to Ms. Colbert, she told Ms. Desmuke on the morning of April 12, 2008, that her son

had a knot on his head and was running a temperature. The next morning, April 13, Ms. Desmuke observed that T.D.S. had vomited and defecated on himself, was not talking normally, and had a large knot on his head. She believed that T.D.S. should have been taken to the hospital by ambulance at that time, but never mentioned this to the nurse during their telephone call. Ms. Desmuke does claim she asked the nurse to come to the facility quickly, however, the nurse denies that Ms. Desmuke conveyed any sense of urgency. The nurse says that Ms. Desmuke told her only that T.D.S.'s face was a little bit swollen, and he might have pink eye.

The nurse had not responded by early afternoon on April 13, when T.D.S. was found in his cell in his own vomit. Again, he was non-responsive. Ms. Desmuke telephoned the nurse at 12:57 p.m., and was told to call an ambulance. But instead of calling 911, she paused for a six-minute telephone call to her supervisor, in which she repeated her belief that T.D.S. should have gone to the hospital a long time ago. Despite her belief that T.D.S. should have gone to the hospital by ambulance as early as 9 a.m., she did not call an ambulance until 1:07 p.m. – four hours after Ms. Desmuke knew that T.D.S. was seriously ill and she herself believed that an ambulance was needed. Based on these facts, a jury could reasonably conclude that Ms. Desmuke's delay in calling 911 demonstrated deliberate indifference to T.D.S.'s serious medical needs, and we reverse the district court's holding on this issue.

-12-

Although Ms. Colbert has presented sufficient evidence to survive summary judgment regarding the delay in medical treatment claim, on remand, the district court will need to address whether there is sufficient evidence that Ms. Desmuke's actions (or inaction) represented the execution of an official policy.[7] *See Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978) (holding that a local government may be held liable for its employee's constitutional violation only when the employee is "execut[ing the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy"). The court did not reach this issue because it found that there was no constitutional violation. We decline to address it and instead remand to the district court for consideration in the first instance.

IV.

We address now the failure-to-protect claim, which is based on the fact that T.D.S. was injured while detained at the Center. "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such

---

[7]    The Center's written policy and procedure allows a shift supervisor such as Ms. Desmuke to call "Ambulance 911," when there is no medical staff on site and "the resident needs hospitalization," Aplt. App., Vol. 1 at 189. But according to Ms. Colbert, Ms. Desmuke was unaware of the written policy; instead, she was trained and instructed to contact the nurse on call to make the decision whether to call an ambulance and to also notify a facility administrator prior to calling 911. There is also some evidence that the director of the juvenile bureau has the authority to implement policy changes without the approval of the County, although it is unclear under what circumstances he can do so.

claims." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted). To prevail on such a claim, a detainee must satisfy a two-part test. He must first establish the objective component, i.e., that "he [was] incarcerated under conditions posing a substantial rise of serious harm." *Farmer*, 511 U.S. at 834 (citation omitted). Second, he must meet the subjective prong, which requires him to establish that the prison official had a "sufficiently culpable state of mind." *Id.* (quotation omitted). In a case involving the failure to protect, as in other conditions-of-confinement cases, "that state of mind is one of deliberate indifference to inmate health or safety." *Id.* (quotation omitted).

In her complaint, Ms. Colbert alleged that T.D.S. "was severely assaulted by either another inmate or Detention Officer resulting in a serious brain injury." Aplt. App., Vol. 1 at 13. In response to the County's motion for summary judgment, Ms. Colbert advanced a third theory as to how T.D.S. was injured – he was placed in a cell that was known to overheat, and became dizzy and fell. On appeal, she criticizes the court for "fail[ing] to acknowledge and discuss Plaintiff's argument that [the County's] deliberate indifference as to the condition of excessive heat in upper tier cells caused T.D.S. to become hot and dizzy and to pass out from the heat of his cell, resulting in his head injury." Aplt. Opening Br. at 20. Setting aside the fact that the court did acknowledge there are "multiple

potential explanations of his injury," Aplt. App. ,Vol. 1 at 206, it is the existence of competing theories that dooms the claim.[8]

To survive summary judgment, Ms. Colbert must, among other things, present evidence of a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quotation omitted). But without knowing how T.D.S. was injured and thus who allegedly violated his constitutional rights, the claim must fail because there is no way to determine whether that person had a culpable state of mind.

We AFFIRM the district court's grant of summary judgment on the conditions of confinement claim. We REVERSE the grant of summary judgment on the deliberate indifference to serious medical needs and remand for further proceedings consistent with this order and judgment.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

---

[8] The County argues that Ms. Colbert never raised an overheated cell as the mechanism of T.D.S.'s injuries in the district court, and thus she should be precluded from raising it for the first time on appeal. Our review of the record reveals that she did raise this theory in response to the motion for summary judgment. Aplt. App., Vol. 1 at 143, 147-48, and 154. More to the point, the district court mentioned the overheating theory in its order. *Id*. at 206 n.13.