**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 25, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

ESTATE OF ANGELO WRIGHT,

    Plaintiff - Appellant,

v.

BRUCE BURNHAM,

    Defendant - Appellee.

No. 22-4033
(D.C. No. 4:18-CV-00084-DN)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.
_____

Angelo Wright was an inmate with the Utah Department of Corrections (UDC). On December 22, 2016, he was transferred from the San Juan County (SJC) jail to the Central Utah Correction Facility (CUCF) due to slow healing ulcers on his right leg. On December 23, Nurse Jason Jackman evaluated Mr. Wright, found no infection, and reported his findings to prison physician Bruce Burnham, who

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

formulated a treatment plan.  On December 29, CUCF medical staff discovered the ulcers on his right leg had become infected.  Mr. Wright was transferred to the hospital that same day, but the infection led to the amputation of his right leg below the knee.

Mr. Wright sued Nurse Jackman and Dr. Burnham.[1]  His amended complaint sought relief under 42 U.S.C. § 1983, asserting that the defendants violated his rights under the Eighth and/or Fourteenth Amendments to be free from cruel and unusual punishment.  He alleged that defendants' deliberate indifference to his medical needs caused his leg to become so infected that it required amputation.  He further alleged that the infection could have been diagnosed, treated, and stabilized before December 29, 2016.  Mr. Wright also brought a claim under the Utah Constitution.

Defendants moved for summary judgment, arguing they provided appropriate treatment for Mr. Wright on December 23.  Mr. Wright conceded summary judgment was proper as to Nurse Jackman but not for Dr. Burnham.

The district court granted summary judgment for Dr. Burnham.  It said that even if Dr. Burnham misinterpreted Mr. Wright's symptoms, his conduct did not

---

[1] The amended complaint also named John Does 1-5, alleging they were medical staff at CUCF, aware of Mr. Wright's condition, and deliberately indifferent to his medical needs.  But these unnamed defendants were never served.  The district court's summary-judgment decision is final.  *See Raiser v. Utah Cnty.*, 409 F.3d 1243, 1245 n.2 (10th Cir. 2005); *Bristol v. Fibreboard Corp.*, 789 F.2d 846, 847 (10th Cir. 1986).

demonstrate deliberate indifference to Mr. Wright's medical needs.  Mr. Wright

appeals.[2]  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*

Mr. Wright suffered from a chronic condition known as venous stasis ulcers,

which are open wounds occurring around the ankle or lower leg and caused by poor

circulation.

 In April 2015, while in UDC custody, Mr. Wright developed ulcers on his left

leg.  In November 2015, when the ulcers had not improved, Dr. Burnham transferred

Mr. Wright to CUCF for more intensive treatment that included daily dressing

changes, compression hose, and occasional sitz baths.  Nurse Jackman participated in

this treatment.  Over several months, the ulcers showed significant improvement.

Once Dr. Burnham was satisfied the ulcers had improved enough, he agreed

Mr. Wright could be transferred to SJC jail in May 2016.[3]

On December 12, 2016, Mr. Wright filed a medical request form asking to see

a doctor about ulcers on his right ankle.  On December 15, he saw Physician

Assistant (PA) Blen Freestone, who assessed the ulcers as slow healing but not

showing signs of infection.  PA Freestone recommended that Mr. Wright see a wound

---

[2] Mr. Wright passed away in March 2021.  His Estate was substituted as plaintiff in August 2021.  We refer to the appellant as Mr. Wright.

[3] Mr. Wright was housed at SJC jail as part of the UDC's Inmate Placement Program (IPP).

care specialist. He explained at his deposition that any referral would be up to the prison physician.

On December 19, an SJC jail staff member emailed Nurse Jackman, reporting that PA Freestone "does not feel that [Mr. Wright's] leg wound is healing the way it should and would like him to see a specialist. We would request that he get transferred back to the prison to have this addressed." Aplt. App., Vol. III at 518. On December 20, Mr. Wright filed another medical request form stating that he could "hardly put pressure on [his] right foot to walk." *Id.* at 517.

After PA Freestone saw Mr. Wright, he contacted Dr. Burnham and told him that "the ulcer[s] on Mr. Wright's right leg were not improving and Mr. Wright should be seen by a provider who was more familiar with treating venous stasis ulcers." *Id.*, Vol. II at 482. Dr. Burnham explained in his declaration that "outside emergency situations, before sending any inmate in an IPP facility to a specialist, it is UDC practice to have a UDC medical provider evaluate the inmate." *Id.*

On December 22, Dr. Burnham ordered Mr. Wright to be transferred back to CUCF "so he could be evaluated by UDC medical staff who were familiar with Mr. Wright's condition and who had the knowledge and experience to properly treat venous stasis ulcers." *Id.* That same day, Mr. Wright was transferred. He arrived at CUCF in a wheelchair.

Nurse Jackman briefly assessed Mr. Wright when he arrived at CUCF on the 22nd. He ordered crutches for Mr. Wright because the ulcers were limiting his mobility. On December 23, Nurse Jackman performed a more thorough assessment.

4

In his notes, he indicated that the previously treated ulcers on the left ankle were almost completely healed, but four new, small ulcers appeared on the back of the right foot and that the area was "red [and] swollen." *Id.*, Vol. III at 520. He observed "[w]eeping" due to the swelling. *Id.* He also noted the area was "raw and macerated," but that "[n]o infection is seen." *Id.* In his declaration, Nurse Jackman said the ulcers were "discolored" and "the skin was friable and irritated." *Id.* at 626. He also testified at his deposition that he did not see any "pus" on Mr. Wright's ankle, and it was not "hot to the touch." *Id.*, Vol. I at 183.

Nurse Jackman consulted with Dr. Burnham, who did not see Mr. Wright.[4] Dr. Burnham ordered dressing changes, compression socks, and crutches. Nurse Jackman also instructed Mr. Wright to keep his leg elevated. Dr. Burnham "believe[d] [Nurse] Jackman ha[d] the knowledge and experience to recognize signs and symptoms of an infection and . . . would have noted any signs of infection and reported them to [him]." *Id.*, Vol. II at 483. Dr. Burnham's rationale for his order was that "[d]aily dressing changes not only promote healing but allow for medical staff to assess the wound daily for changes and address signs of infection as they arise." *Id.* The wound was cleaned with saline and covered with Xeroform gauze and a Telfa pad. Dr. Burnham then left on vacation for a week.

---

[4] The parties dispute whether Dr. Burnham saw Mr. Wright in person. But the district court determined this fact was not material to its decision. Viewing the facts in Mr. Wright's favor, it assumed Dr. Burnham did not visit or see Mr. Wright on December 23. We make the same assumption.

On December 24, another nurse saw Mr. Wright and completed a dressing change, noting that Mr. Wright did not exhibit signs or symptoms of an infection. Mr. Wright declined medical treatment on December 25 and 26, saying he would change his dressing himself. On December 27, a medical technician cleaned Mr. Wright's wound with saline and placed Xeroform gauze on the wound, covered by a Telfa pad. Mr. Wright refused dressing changes on December 28 and 29. But then later on December 29, he told the guards he was in significant pain, and he had a hole in his ankle that was oozing white liquid.

Mr. Wright was brought to the clinic where Nurse Jackman saw an open wound with drainage mixed with blood and more discolored than it was before. He cleaned the wound with saline, administered a shot of antibiotics, and transferred Mr. Wright to the University Medical Center (UMC) that same day due to concerns Mr. Wright had an infection. Despite UMC's best efforts, the infection ultimately led to a below-the-knee amputation of Mr. Wright's right leg on January 21, 2017.

### B.  *Procedural History*

Mr. Wright filed his complaint in state court in November 2018, and the defendants removed it to federal court. Mr. Wright filed an amended complaint in January 2020, bringing claims under § 1983 and the Utah Constitution.

In December 2020, Mr. Wright's expert, Dr. John Deacon, prepared a report. In it, he opined that: the x-ray report from December 29 showed that Mr. Wright had an infection on December 23; Nurse Jackman's assessment violated the standard of care because Mr. Wright "had physical exam findings that were consistent with

6

infection," but Nurse Jackman did "not recognize [a] likely infection with the constellation of findings present in this case," Aplt. App., Vol. III at 533, 534; Dr. Burnham violated the standard of care because he should have conducted his own examination of Mr. Wright, but even if he didn't examine Mr. Wright, he should have acknowledged infection as the most likely diagnosis based on the information Nurse Jackman provided; if the infection had been properly treated with antibiotic therapy, Mr. Wright would not have developed septic arthritis; and "[i]f not for the errors and omissions of Nurse Jackman and Dr. Burnham, Mr. Wright would have avoided below-knee amputation," *id.* at 539 (boldface omitted).

Dr. Burnham moved for summary judgment based on qualified immunity. The district court granted summary judgment in Dr. Burnham's favor on the § 1983 claim. It declined to exercise supplemental jurisdiction over Mr. Wright's state-law claim, so it dismissed that claim without prejudice. Mr. Wright appeals from the district court's decision.

## C. *Legal Framework*

### 1. **Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1177-78 (10th Cir. 2020) (quotations omitted). A defendant's assertion of a qualified immunity affirmative defense "creates a presumption that the defendant is immune from suit." *Id.* at 1178 (brackets and quotations omitted). To

overcome this presumption, the burden shifts to the plaintiff to "show (1) facts that demonstrate the [defendant] violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020).

## 2. **Deliberate Indifference**

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). This includes "deliberate indifference to an inmate's serious medical need." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

"To establish deliberate indifference based on prison officials failing to attend to an inmate's serious medical needs, a plaintiff must satisfy an objective and subjective component." *Smith v. Allbaugh*, 987 F.3d 905, 910 (10th Cir. 2021). "The objective component of deliberate indifference is met if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause." *Sawyers*, 962 F.3d at 1283 (quotations omitted). "To satisfy the subjective component, the plaintiff must show the official knows of and disregards an excessive risk to inmate health or safety." *Id.* (quotations omitted). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotations omitted).

In determining whether the subjective component has been established, we have recognized "two types of conduct constituting deliberate indifference"—failure to treat and failure to act as a gatekeeper. *Sealock v. Colorado*, 218 F.3d 1205, 1211

8

(10th Cir. 2000). The first and most common type is when a medical professional acts in a treating role and the "medical professional may fail to treat a serious medical condition properly." *Id.* But "[w]here this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* The second type is when a prison official or medical professional knows that his role is to serve as a gatekeeper for other medical personnel capable of treating the condition, but "he delays or refuses to fulfill that gatekeeper role" and "prevent[s] an inmate from receiving treatment or den[ies] him access to medical personnel capable of evaluating the need for treatment." *Id.*

"In some circumstances there may be a clear difference between a provider and a gatekeeper. But . . . a physician's role often involves treating the patient while simultaneously considering the need for referral to someone with more specialized training at the same time." *Lucas v. Turn Key Health Clinics, LLC*, --- F.4th ---, No. 22-5002, 2023 WL 327846, at *9 (10th Cir. Jan. 20, 2023) (citation and quotations omitted). So a medical professional can act as both a provider and gatekeeper simultaneously, and can be liable under either or both theories. *Id.* at *9 & nn. 4-5.

## D. *District Court Decision*

The district court determined that the first prong of the qualified immunity test—whether there was a constitutional violation—was dispositive, so it did not address the second prong—clearly established law. The court explained that

9

"[b]ecause Wright has not carried his qualified-immunity burden of providing evidence of material facts supporting his view that Defendant breached his federal constitutional right, Defendant is protected from further litigation in this matter, without consideration of whether the law was clearly established at the time of the defendant's conduct." Aplt. App., Vol. V at 1181 (quotations omitted).

In deciding Mr. Wright had not shown a constitutional violation, the district court first found that Mr. Wright met the objective component of the deliberate-indifference test because his infection and amputation showed that he "endured an objectively serious harm." *Id.* at 1175. But the court next determined that Mr. Wright had not satisfied the subjective component because he had not offered evidence that Dr. Burnham knew of and disregarded a substantial risk to Mr. Wright's health.

In reaching this conclusion, the district court relied on undisputed facts presented in Dr. Burnham's motion for summary judgment showing that:

- Defendant was aware that Wright had been successfully treated at CUCF in the previous thirteen months for a similar past ulcer;

- Defendant had ordered Wright's transfer back to CUCF from SJC jail (just as had happened about thirteen months before) for better treatment of his current ulcers;

- within three days of being notified by SJC that Wright needed better treatment, the same nurse (Jackman) who had contributed to the successful treatment of the past ulcer was assessing Wright in person, on December 23, 2016, upon Wright's arrival back to CUCF;

- though Defendant did not see Wright in-person on December 23, 2016, Defendant consulted with Jackman about Jackman's in-person assessment of Wright as to Jackman's perception that Wright's foot

10

was painful, red, and swollen, the ulcers were not open but were weeping and raw-looking, but that Jackman did not see pus and feel heat coming from the ulcered area and did not believe Wright had an infection that day; [and]

- Jackman had the knowledge and experience to recognize signs and symptoms of an infection and would have noted any signs of infection and reported them to Burnham[.]

*Id.* at 1176-77 (brackets, citations, ellipsis, and quotations omitted). The court also said it was undisputed that Dr. Burnham did not believe Mr. Wright had an infection that day, and that Dr. Burnham ordered treatment for Mr. Wright that was consistent with the need to heal the ulcers. And the court noted:

> Once the consultation was over and Defendant had given the orders, he left on vacation, no doubt with the expectation that the orders would be carried out and daily assessments would alert on-duty medical staff to lack of healing of the wound, or signs of infection that might arise. This is exactly what happened, with the infection being discovered on December 29, 2016, and Wright being transferred to UMC that same day.

*Id.* at 1177 (citation omitted).

The district court acknowledged that Mr. Wright's expert found "plenty of fault" with Dr. Burnham's care of Mr. Wright and opined that Dr. Burnham did not observe "the standard of care for Wright's situation." *Id.* at 1178 (quotations omitted). But the court explained, "While it may be true that 'the medical standard of care' demanded more from Defendant, . . . Wright's constitutional rights did not." *Id.* at 1179. "Unfortunately, Wright's symptoms were possibly misinterpreted by Defendant but this falls well below the culpable state of mind necessary to support a deliberate indifference allegation." *Id.* at 1180 (quotations omitted).

11

The district court also rejected Mr. Wright's attempts "to cast Defendant as a gatekeeper" when the evidence showed "he did not see that as his role." *Id.* at 1181. The court explained that Dr. Burnham was primarily responsible for providing medical care, he was experienced in treating wounds, and there was no evidence he thought of his role as a gatekeeper for other medical professionals capable of treating Mr. Wright's wounds.

## II.  DISCUSSION

We review de novo a grant of summary judgment based on qualified immunity. *Mata*, 427 F.3d at 749. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Sawyers*, 962 F.3d at 1282 (quotations omitted).

## A.  *Gatekeeper*

Mr. Wright first argues that he "raised an issue of fact regarding Burnham's subjective knowledge where Burnham never assessed [him] yet denied him access to a specialist referred by another physician." Aplt. Opening Br. at 16 (boldface and underline omitted). He contends that Dr. Burnham committed deliberate indifference in his role "as gatekeeper to outside medical experts." *Id.* at 17 (underline omitted).

We first note that this argument contains factual inaccuracies. There was no other "physician" who referred Mr. Wright to a specialist. Although PA Freestone recommended that Mr. Wright see a specialist, he acknowledged that the prison

12

doctor would decide whether Mr. Wright should see a specialist. It is therefore not accurate to state that Dr. Burnham denied Mr. Wright access to a specialist that another physician had referred him to see.

In support of his gatekeeper argument in district court, Mr. Wright presented evidence that prison policy generally required a doctor at CUCF to decide whether to refer a prisoner to a specialist. A jury might be able to infer from this evidence that Dr. Burnham acted simultaneously as a treating physician and a gatekeeper.[5] But even if Dr. Burnham acted in part as a gatekeeper, there is no evidence that he consciously decided not to refer Mr. Wright to a wound specialist, and even if there were, there is no evidence that he did anything other than exercise his considered medical judgment, which is not deliberate indifference. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (explaining that "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment" and "[m]atters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing").

Moreover, the undisputed facts show that when Nurse Jackman evaluated Mr. Wright on December 23 and communicated his assessment to Dr. Burnham, he

---

[5] We recently clarified that a doctor can act as both a provider and a gatekeeper and that a plaintiff need not show the doctor was acting "solely" as a gatekeeper to establish liability under a gatekeeper theory. *Lucas*, 2023 WL 327846, at *9 & n.5.

did not indicate any concerns that Mr. Wright's condition required emergency and/or specialty care. After consulting with Nurse Jackman, Dr. Burnham ordered a treatment plan consistent with Mr. Wright's symptoms, and consistent with the treatment plan he had successfully implemented for the ulcers on Mr. Wright's other leg. Mr. Wright's expert did not say that Dr. Burnham was not capable of treating Mr. Wright's condition or that Dr. Burnham should have referred Mr. Wright to a specialist or for emergency care on December 23. Instead, the expert opined that Nurse Jackman and Dr. Burnham could have provided the proper care on that day but failed to do so.

We therefore agree with the district court that Dr. Burnham was entitled to summary judgment on Mr. Wright's gatekeeper theory.

## B. *Treating Physician*

Mr. Wright next asserts that, even if Dr. Burnham was not a gatekeeper, "there is still a dispute of fact as to subjective indifference where Dr. Burnham failed to both properly assess and treat Wright's condition." Aplt. Opening Br. at 21 (underline omitted). We disagree. We have explained that "the negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self*, 439 F.3d at 1233 (quotations omitted). We have further explained that "[s]o long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.* "Indeed, our subjective inquiry is limited to consideration of the doctor's knowledge

14

at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary." *Id.*

Mr. Wright contends that Dr. Burnham failed to treat his condition properly because Dr. Burnham "never assessed" him in person. Aplt. Opening Br. at 21. But Dr. Burnham did assess Mr. Wright's condition based on his knowledge of Mr. Wright's medical history and the information Nurse Jackman relayed to him from Nurse Jackman's physical examination of Mr. Wright. Although Mr. Wright's expert opined that Dr. Burnham's conduct in not examining Mr. Wright in person fell below the standard of care, negligence or medical malpractice does not give rise to a constitutional violation. *See Self*, 439 F.3d at 1233.

The undisputed evidence shows Dr. Burnham did not believe there was an infection when he prescribed treatment for Mr. Wright, and "[h]e prescribed care consistent with Wright's symptoms on December 23—care that had successfully treated the ulcers in Wright's other leg." Aplee. Br. at 14. As the district court noted, it is possible that Dr. Burnham misinterpreted Mr. Wright's symptoms, but Dr. Burnham did provide a treatment plan for the condition he believed was causing Mr. Wright's symptoms, a treatment plan that worked successfully in the previous year. We therefore agree that because Dr. Burnham "promptly ordered a reasonable treatment plan, the district court correctly concluded that Dr. Burnham did not consciously disregard Wright's medical needs." *Id.*

## III.  CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge